## AEROVOX CORPORATION v. CONCOURSE ELECTRIC CO., Inc.
### No. 395.

Circuit Court of Appeals, Second Circuit.

May 15, 1933.

Dean, Fairbank, Hirsch & Foster, of New York City (Morris Hirsch and F. J. Foster, both of New York City, of counsel), for appellant.

Albert Lavenburg, of New York City (Paul Kolisch, of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

## L. HAND, Circuit Judge.

This is the usual bill in equity for the infringement of two patents, each concerned with a dry electrolytic condenser for use in radio receiving sets. The first is for a new form of cell; the second for the electrolyte to be used in it. A few words of general explanation are necessary at the start. An electric condenser is a device by which excesses of current are stored and released, acting as a sort of elastic cushion for its variations. It is made up of two electrodes, anode and cathode, separated by a non-conductor, the dielectric. The capacity of the condenser depends upon the dielectric, and varies inversely with its thickness. It had long been known that an excessively thin film on the anode, or positive electrode, was the optimum dielectric. Various metals had been used for the purpose; aluminum, the metal chosen in the patents, was well-known; the film was made by passing an electric current across the electrodes in a bath made up of a solution, which was known as the electrolyte. This was called "the forming process." When complete, the anode with its dielectric film was ready for use and with the cathode made the condenser. However, in use the dielectric degenerates; moreover, it is subject to puncture, if the voltage becomes too great for its tolerance and the condenser then becomes useless, unless restored. Thus it was necessary that in use an electrolyte should be present both to preserve the dielectric and to restore it in case of rupture. In a wet condenser the electrolyte is a bath of proper solution in which both electrodes are immersed, the solution being in effect part of the cathode. In a dry condenser the electrolyte is absorbed by a gauze interposed between the cathode and the dielectric. The two patents concern such a condenser; the first relates to its make-up, the second to the electrolyte. We will first take up the "structure" patent.

As we have just said, the art of dry condensers had before the application been familiar with a gauze between the electrodes soaked like a sponge in the electrolyte; this would cause the film to be replaced, as it wore out, or was ruptured. To insure against leakage of the electrolyte the condenser was covered with pitch or wax, filling the spaces between the sides of the box and the condenser proper. The electrodes with intervening gauze were of large area and were rolled upon themselves into a cartridge, one terminal being fastened to the edge of the anode and the other to that of the cathode, to which conducting wires might be attached. Thus the box, sometimes of metal, sometimes not, was insulated from the condenser and the electrolyte had no means of escape. In operation heat is generated by electrolysis and with it gas. As a result the gas forms a path through the pitch or wax, and the electrolyte follows through the passages so made. The connection so established by the electrolyte causes a galvanic action between the metal parts, electrodes and box, if these are of different metals, and a loss of current between the cathode and the box when that is of any metal. One or both of these difficulties had existed in all dry condensers before Georgiev, whenever the box was of metal.

He proceeded upon a new theory. His condenser was, indeed, made up of the same parts as those which preceded, but instead of filling the spaces between the cartridge and the walls of the box with pitch or wax, he left them open, thus allowing any leakage of electrolyte to drain to the bottom and any gas produced to escape. To neutralize corrosion by galvanic action and loss of current, he directly connected the cathode with the box, which he made of the same metal, aluminum. The result was that there could never be any difference in potential between them and no current would leak, the negative terminal being on the box itself. These details are indeed simple when once conceived, but the result was new, and the success immediate and great. The new condensers went into wide use and have largely supplanted the old. Nothing of the sort had appeared before, unless it be Ruben, No. 1,714,191, which was for a dry condenser cell with a space between the top of the box and the top of the cartridge. Nothing appears in the specifications of this patent indicating that this was a part of the invention, and the only basis for claiming anticipation is in the figure. An insulator closely filling the space between the sides of the box and the cartridge, was, however, both shown in the figure and specified. The space at the top did not answer the purposes of Georgiev. If the electrolyte was forced up and into it, it would have the same action as though there had been no insulating cover to the cartridge, and no provision was made to prevent its action after it established a connection between the electrodes and the wall. It is indeed not clear that the space indicated in the figure was intended for more than to disclose the

terminals and their connections. In any case the disclosure was plainly insufficient.

 It seems to us that, although the combination was not a long step forward, it was enough to support a patent. As we have already intimated, it does not stand merely upon the structural details necessary to carry it out; once conceived these were not serious. Bengough and Stuart, No. 1,771,910, had already disclosed the importance of having all parts, which dipped into the electrolyte, of the same metal, and aluminum at that. This it is true was during the "forming process," but the condenser must be made so that this process shall continue during operation. Moreover, the connection of the cathode to the wall was an obvious enough means of securing equal potential between the two and avoiding current losses. We do not therefore rest upon these, and should agree with the learned judge in thinking that no invention had been made, if that were all. But we think that they were mere incidents of a new, a quite new, idea for such a condenser; that is, not to insulate it at all, but to allow it to be set loosely in the box. This had theretofore been supposed to be objectionable for the reasons we have given. Georgiev thought otherwise and abandoned the uniform course of the art. The situation is an old one in patent law; the omission of what had been thought necessary before, and the substitution of simple contrivances which better answered the difficulties. When an art has for long gone on the assumption that it is necessary to retain an element, ineffective and uncertain in operation, its omission ought not to be rated within the compass of the routineer. History is a safer guide than speculation after the event.

The electrolyte patent, as its name implies, is for the composition and preparation of the substance with which the gauze between the electrodes is impregnated. Georgiev swore that he had come by his solution only after a long series of experiments, and that the theoretical explanation of his success was not clear to him at the end. He was after a dielectric to resist high voltages, five hundred and more, which the art had come to need. What he finally devised is a solution of boric acid, glycerol and ammonia water or gas in prescribed percentages. These are the raw materials and must be boiled until the boiling point becomes 130° C., at which it is held for five minutes, by which a chemical reaction ensues from which as end products emerge ammonium glycerol borate and glycerol borate of a prescribed viscosity. This was the patented electrolyte and this he claimed. He had also process claims which covered the steps by which to obtain the solution.

The success of Georgiev's condenser, which we have already mentioned, was probably due more to his electrolyte than to the make-up of the condenser, because it created a tougher dielectric which could resist the higher voltages, something that no one had devised theretofore, unless it be Chubb, No. 1,270,784, which we shall discuss later. There had indeed been various electrolytes having boric radicals as a base; these had all been for wet cells and developed a weaker resistance to puncture. The nearest, and therefore those to which we may confine our discussion, are Peek, No. 1,008,860, Hayden, No. 996,583, and Zimmerman, No. 1,-074,231. Peek's electrolyte was made up of boric and tartaric acids in the proportion of six to one, neutralized by alkalis, among which ammonium was one. To this he added 10% of glycerin to make the solution slightly acid. All the claims include tartrates as well as borates and the proportions of glycerin to boric acid was far below Georgiev's formula. Moreover there was no suggestion of boiling or of any prescribed viscosity. The defendant answers that these omissions were inevitable because Peek disclosed a wet cell, where boiling would be absurd and there could be no viscosity. That is quite true, but the disclosure at most went no further than to recommend the use of boric acid, ammonia, and glycerin, as an electrolyte. We agree that the art had gone so far.

Hayden had earlier disclosed an electrolyte in a wet cell composed of equal parts of ammonium octoborate and glycerin in equal parts, which he described as making a dielectric capable of withstanding "high voltages"; how high he did not say. The proportions were altogether different from Georgiev's, and we should have no right to suppose that the electrolyte would have the same effect as his in a dry condenser, if merely reduced to Georgiev's viscosity. Certainly Hayden had no such idea in mind. Zimmerman also was earlier than Peek; his electrolyte is closer, because it omitted tartaric acid, and used only boric acid, ammonium salt and glycerin. He too said that it would resist high voltages. But the proportion of glycerin to boric acid, though higher than Peek's, was never more than forty per cent.; Georgiev's was over 150%. Moreover, there is no evidence that either the boric acid or the ammonium borate ever went into chemical composition with the glycerin; and apparently this could only be true in case the mixture

was boiled. Zimmerman also was working with an electrolyte in a wet cell, and again it would be gratuitous to say that a decrease in water to an appropriate viscosity would have resulted in Georgiev's product. Even if we so assumed, the step was not taken.

Chubb did indeed profess to have discovered an electrolyte capable of resisting five hundred volts and more; it was in a wet cell. Its composition was of boric acid and ammonium borate alone, the first being between ninety-seven and ninety-eight per cent. of the mixture; it did not mention glycerin and is much further from Georgiev than any of the three just mentioned. We may ignore it. In another patent than that already mentioned, Ruben described, 1,710,073, more particularly the electrolyte which he used. Being in a dry condenser it had indeed to be viscous and he expressly said so, though he left the viscosity to be determined by the user. Certainly he had no notion that the limits were critical, as Georgiev insists, correctly, so far as this record shows. Ruben used boric acid in conjunction with sodium borate, and glycerin as a retaining element. The sodium borate was indeed an equivalent of ammonia and the raw materials were all present, though the proportion of boric acid was small. But he did not boil these and thus produce the glycerol borates on which Georgiev depended. Both in the limits of viscosity and in the chemical reactions, he failed to anticipate. Roder in his Austrian patent, No. 61,186 (1913), had indeed disclosed the production of a new glycerolboric acid by boiling to between 130° and 150° C., and we may assume that this was an equivalent of Georgiev's end products. But he was working in quite another field, disinfectants, and his product was wholly unsuited for an electrolyte. Certainly to select it as such was not an obvious use of it; the reference appears to us too remote to be serious.

 This is a résumé of all the art which at all approaches Georgiev. As we have said, the best references are Peek, Hayden and Zimmerman, all of which the Examiner cited, and thought not pertinent. We agree. The most that can be said is that they set Georgiev upon what proved to be the proper path; they disclosed that the substances he used were desirable for an electrolyte in a wet cell. From that it was indeed natural to infer that they might be suitable for a dry condenser, in which the action was the same. But they did not serve as they stood. They would not make a dielectric for such voltages as Georgiev had to meet; the judge so found

and so Georgiev learned by experiment. It was necessary for him to fix the proper limits of viscosity and to establish the necessity of transforming the raw materials into the end products by boiling. This made a new electrolyte never before used in a dry condenser, one which for the first time produced a film which would resist voltages of five hundred. Indeed except for Chubb, Georgiev was the first to produce such a film in any condenser, dry or wet. Before him the necessary resistances had been created by coupled condensers, an admitted disadvantage, for it adds to the expense and requires more room. It is no answer to his claims that he stood on the shoulders of those who went before; all inventors do so. It is enough that he used the earlier materials, known to be appropriate for his problem, in a new way, prescribing the proportions, the preparation by boiling, the needed viscosity. Indeed, it is not strictly true even to say that he used materials ever used before as an electrolyte. In the raw they were old, but his treatment of them resulted in new compounds, not earlier used as an electrolyte at all. We think that the claims are valid.

The infringement of the first patent scarcely needs discussion. The most plausible argument is that there are no spaces between the walls of the box and the cartridge. That is a matter of degree. Concededly the defendant uses neither pitch nor wax as an insulator and the shoulder just below the top of the box makes the opening the narrowest diameter. A cartridge, inserted from above, cannot touch the walls, and the space left gives opportunity for the escape of gases, and incidentally lets out any electrolyte that may leak. This was the essence of the invention. The evidence as to the infringement of the electrolyte claims turns on whether the defendant used in its condensers, ammonium glyceryl borate and glyceryl borate, for the evidence as to viscosity was enough. This applies as well to process claims 8, 9, 10 and 14, as to the product claims, because any "boiling" sufficient to transform the boric acid, glycerol and ammonia into the two end products was the "boiling" described in those claims. The important issue is of the transformation of the materials. However, we are in doubt whether the defendant ever brought its mixture to a temperature of 130° C.; the plaintiff's testimony scarcely goes further than to show that it reached the proper viscosity and chemically transformed the raw materials into the specified end products. On the whole we agree with the judge that there was evidence of this; though it is to be noted

that Roder specified as a lower limit, 130° C. Claims 11 and 12 must be read as requiring that temperature, and our doubt compels us to hold that they are not shown to have been infringed. The decree must be limited to the four product claims, and to claims 8, 9, 10 and 14.

Decree reversed.