AEROVOX CORPORATION v. MICAMOLD RADIO CORPORATION.

No. 7043.

District Court, E. D. New York.

May 14, 1936.

Dean, Fairbank, Hirsch & Foster, of New York City (Morris Hirsch, of New York City, of counsel), for plaintiff.

Ward, Crosby & Neal, of New York City (Kenneth S. Neal and Raymond J. McElhannon, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit for the alleged infringement of patent No. 1,815,768, issued to Alexander Georgiev assignor to Aerovox Wireless Corporation, now Aerovox Corporation for Electrolyte, granted July 21, 1931, and patent No. 1,789,949, issued to Alexander Georgiev assignor to Aerovox Wireless Corporation, now Aerovox Corporation, for Electrolytic Cell, granted January 20, 1931.

Both of the patents in suit were adjudicated valid and infringed by the Second Circuit Court of Appeals on appeal from the Southern District Court of New York, in Aerovox Corporation v. Concourse Electric Co., Inc., 65 F.(2d) 386.

The defendant Micamold Radio Corporation manufactures and sells dry electrolytic condensers that are alleged to infringe the Structure patent 1,789,949, and makes electrolyte for its dry electrolytic condensers alleged to infringe the electrolyte patent 1,815,768.

Both of the patents in suit were involved by way of counterclaim in the suit of Ruben Condenser Co. et al. v. Aerovox Corporation tried in this court before me and reported at 7 F.Supp. 168. The Circuit Court of Appeals affirmed this court's dismissal of the counterclaim in the Mallory Case (Ruben Condenser Co. et al. v. Aerovox Corporation; 77 F.(2d) 266), because it agreed with this court that Mallory was entitled to immunity under the structure patent 1,789,949, and it further held that such immunity also applied to the electrolyte patent 1,815,768.

As to the structure patent 1,789,949, this court has already analyzed all of the art of any consequence adduced in the case at bar and the Circuit Court of Appeals had previously found validity as to claims 11 and 19, and this court went further in also finding claim 18 valid and all three of said claims infringed by the Mallory condensers.

As to the electrolyte patent 1,815,768, claims 8, 10, and 11, here in suit, had all been held valid by the Circuit Court of Appeals in the Concourse Case. Defendant in the case at bar has failed to raise a single defense that was not presented in the Concourse Case and again presented more fully in the Mallory Case.

The Circuit Court of Appeals found in the Mallory Case that glycol is the equivalent of glycerin in this art of electrolytic condensers. Glycol is disclosed as such equivalent in patent 1,815,768 here in suit.

By stipulation certain testimony and exhibits in the Mallory Case may be received in evidence with the same force and effect as if the corresponding witnesses had so testified, and the said exhibits had been offered in the present suit.

I will first consider the patent in suit No. 1,815,768, which is herein called the electrolyte patent, claims 8, 10, and 11 of which are in suit.

This patent was upheld in the Concourse Case in the Circuit Court of Appeals of the Second Circuit, 65 F.(2d) 386, which recognized that it was an invention of pioneer character, saying at page 389: "This made a new electrolyte never before used in a dry condenser, one which for the first time produced a film which would resist voltages of five hundred."

The evidence in the case at bar and also in the Concourse Case and the Mallory Case does not show that, prior to Georgiev's invention, any one had taught how to make a practically useful dry electrolytic condenser capable of withstanding 500 volts, either according to Georgiev's, or in any other manner. In fact, prior to Georgiev's invention I am convinced that there did not exist dry electrolytic condensers of more than a small fraction of 500 volts.

Electrolytic condensers of fairly high voltage of the wet type are in the prior art, but the maximum limit appears to be 400 volts.

These prior wet electrolytic condensers were disposed of by the Circuit Court of Appeals in the Concourse Case, even though Zimmerman 1,074,231 had gone so far as to use the same raw ingredients as Georgiev used.

In both the Georgiev patent 1,815,768 and the Zimmerman patent 1,074,231, the ingredients used are the same and are (1) boric acid, (2) an alkali borate, and (3) a polyhydric alcohol. Boric acid is used as such. The preferred alkali borate is ammonium borate either introduced as such or by the combination of boric acid with ammonia water or ammonia gas. The poly-

hydric alcohol may be glycerin "or any alcohol with two or more hydroxyl radicals such for instance as glycol glucose, etc."

Georgiev's process consists not merely in heating the mixture to cause the solids to enter into solution in the polyhydric alcohol as in the prior art, but the invention involves continuing the heating long after the solution is completed, by boiling said solution, in which operation the boiling point thereof steadily rises and this boiling is continued until the mass reaches a definite predetermined boiling point. The boiling must not, however, be carried too far, for when the boiling point rises above permissive values, the electrolyte loses efficiency and becomes worthless.

Georgiev's simple procedure has practical effects. The experts agree that when a given mixture of raw ingredients, including polyhydric alcohol, boric acid, and ammonia (the latter either combined with some of the boric acid or added in the form of ammonia water), has been heated under conditions permitting the loss of water, regardless whether the heat had been applied slowly for a longer period of time or more vigorously for a shorter period of time, then by the time the product has acquired a given boiling point, a definite amount of water will have been evaporated; the chemical reaction to form glyceryl (or glycol) borate and ammonium glyceryl (or glycol) borate will have progressed to a certain extent; and the electrolyte will have acquired definite characteristics from the standpoint of breakdown voltage and power factor. The higher the boiling point the more water will have passed off, the higher the breakdown voltage, and the higher the power factor.

The method of control taught and claimed by patent 1,815,768 and protected by claims held valid in the Concourse Case is dependable, vital, and unique, as success has not been attained in any other way.

The Georgiev patent formulates the following simple directions for making a 500-volt condenser from the particular formula of ingredients illustratively given: "By the simple expedient of heating the mixture as above set forth to boiling and continuing until the boiling point at atmospheric pressure is about 130 degrees C and holding the solution at this temperature for preferably at least five minutes, the preparation of the electrolyte is completed."

The completion of the boiling operation as disclosed in the patent could be deter-mined by its temperature, or its loss of weight due to the amount of water given off, or by its viscosity, since said three determining characteristics are interrelated for the final electrolyte as obtained from any given formula of raw ingredients.

The extent of the chemical reaction depends on the amount of water driven off.

"Boiling point control" is the easiest of the three interrelated alternative modes of control, and that is why it is used, in practice, in preference to viscosity control or control by measurement of water lost and is specified in the foregoing quotation from the patent and is used by Aerovox—and also by Micamold.

The specification of patent 1,815,768 at its end says: " * * * But reasonably satisfactory results are obtained though the electrolyte in original preparation is boiled for a much less period of time than according to the preferred practice above set forth."

The invention is not limited to any one particular boiling point. This appears not only on the face of the patent, but was also found by the Circuit Court of Appeals in the Concourse Case, where claims 8, 9, 10, and 14 were found to be infringed despite the doubt there expressed by the court that the defendant "ever brought this mixture to a temperature of 130 degrees C."

Patent 1,815,768, therefore covers "boiling point control" of electrolytes of polyhydric alcohol, ammonia, and boric acid, and such control to a boiling point of "about 130 degrees C," is but one specific embodiment of the invention.

It does not seem to me that plaintiff has attempted in the suit at bar to limit the broad term "boiling," as used in claim 10, to the more specific concept of "controlled boiling"; on the contrary the plaintiff maintains that "boiling," as broadly recited in claim 10, is as new and original with Georgiev on the present record, as it was on the Concourse record on which said claim was sustained.

The Circuit Court of Appeals in sustaining broad claim 10, held that boiling, as applied to an otherwise old and known solution of electrolyte ingredients, was not obvious and constitutes invention. The step was not obvious to skilled workers, and that is clearly apparent when you consider the fact that the engineers of the General Electric Company and of the

Westinghouse Electric & Manufacturing Company, whose patents are set up in Defendant's Exhibit B as anticipations, did not teach the boiling of an electrolyte solution.

The new attacks on validity in this case do not seem to me to differ materially from the attacks made unsuccessfully in prior litigations, and may be divided into two classes as follows: (1) "New" chemistry; (2) "New" alleged anticipations consisting of:

(a) Edenburg patent, No. 1,924,711, which issued on an application under which Aerovox was licensed before Georgiev made his invention, and which was unsuccessful.

(b) Ruben patent, No. 1,891,207, which was held invalid in the Mallory Case.

I will take up these defenses in the order named.

"New" chemistry. As I have hereinbefore pointed out, the procedure in carrying out the method of patent 1, 815,768 involves heating the selected raw ingredients not merely until the solids pass into complete solution, but to boiling and then continuing this boiling until a definite and selected boiling point at atmospheric pressure has been reached. Chemical reactions to the desired extent and loss of the desired amount of water occur as an incident of this simple procedure taught by Georgiev.

Plaintiff's expert, Dr. Barsky, in the Mallory Case admitted that such reaction occurs, but advanced the theory that it is carried to completion in the cold, and that the continued heating or boiling merely serves to drive off water created as soon as the ingredients are mixed and even before heating.

In the case at bar, defendant's expert, Cowles, admits that such reaction occurs and further admits that the reaction is advanced as the boiling progresses. The witness states the hypothesis that in the heating and boiling, the orthoboric acid ($H_3BO_3$) used, breaks down to metaboric acid ($HBO_2$) by splitting off water ($H_2O$). Whether we accept the Cowles theory or the one set forth in the patent, the end product, that is, what goes into the final electrolyte is as defendant's expert Cowles admitted, in either event glycerol (or glycol) borate and the corresponding ammonium compounds, and two molecules of water, ($2 H_2O$).

The chemistry devised by the witness Cowles is unsound. The reaction stated in the old Newth test book, on which the witness Cowles relied, can be effectively carried out only in complete absence of water as Mr. Cowles agreed. As long as water is present, no metaboric acid could be formed, and it is admitted, by Cowles, that even in the finished electrolyte there is water, and without it, the electrolyte would be worthless. The compound formed in the reaction suggested by Cowles in Defendant's Exhibit U has no dissociated hydrogen, without which neutralization with ammonia to form ammonium glycerol (or glycol) borate could not possibly occur. With the conventional formula appearing in the patent, however, shown at A in Plaintiff's Exhibit 13, dissociated hydrogen is present to permit the desired chemical combination with ammonia.

This defense does not attempt to establish the validity of the Georgiev patent on the ground that it does not teach something new and useful, but on captious criticism of the conventional formula by which the patent accounts for the results accomplished. No knowledge of abstruse chemistry is needed to duplicate Georgiev's results by simply following the boiling point control directions which he was the first to discover.

"New" alleged anticipations.

The application for Edenburg patent, No. 1,924,711, filed January 25, 1928.

The specification of Edenburg, as filed January 25, 1928, proved to be a failure even on low voltages of 6 volts, and yet defendant argues that it would suggest to any one skilled in the art, the commercially successful process and electrolyte that Georgiev taught, and that Micamold is using for making high-voltage condensers. I reject this defense, as was done in the Concourse Case and the Mallory Case. It is purely hindsight argument, and the Georgiev patent must have required invention, or the prior process would have suggested the improvement to the man skilled in the art promptly after the demand for such improvement arose, instead of losing valuable time before the invention made its appearance.

The defendant's contention is defeated in the case at bar by affirmative history.

Aerovox was induced by Edenburg a few months after he filed his application for patent 1,924,711 to attempt the manu-

facture of electrolytic condensers according to his process on a royalty basis. Edenburg, with a strong financial interest so to do, did his best to supervise and instruct the making of condensers by Aerovox, but failed. The making of a small number of satisfactory low-voltage condensers out of thousands of failures in hit or miss attempts at production, without the knowledge of how to reproduce uniformly satisfactory results at will, is not a true contribution to the art. United Chromium v. International Silver Co., 60 F.(2d) 913, at page 917, in which the court said: "It is plain that they often got good results; it is equally plain that they did not know on what those results depended and could not rely upon producing them. * * * Chance hits in the dark will not anticipate an invention."

Georgiev commenced the task of developing a workable process, first for making low-voltage dry electrolytic condensers, later, much higher voltages, but it was only after a long series of experiments that he came by his solution, and the theoretical explanation of his success was not clear to him at the end.

The value of the Georgiev invention over Edenburg is shown by the fact that by resort to the Georgiev invention 100,-000 scrapped condensers prepared under Edenburg's directions by Aerovox were salvaged; they were satisfactorily reimpregnated with Georgiev's electrolyte and sold.

Mr. Louis Edenburg, the patentee of patent 1,924,711, was not called by the defendant, nor was his testimony in the Mallory Case stipulated, as it might have been, and when plaintiff sought to invoke such testimony in rebuttal the defendant resisted that attempt.

Edenburg, the inventor, did not succeed in 1928, with the same process with which it is now asserted that Cowles succeeded in 1936, and I am convinced that if Cowles obtained better results in 1936 than did Edenburg in 1928, it was because Georgiev's teachings were available to and used by Cowles in 1936, and unavailable to and not used by Edenburg in 1928.

The Edenburg patent discloses, page 1, line 36: "I prefer to employ aluminum foils interleaved with paper and unpregnated in a bath of glycerin and borax. To permit the glycerin and borax solution to permeate the condenser more quickly and thoroughly, the impregnation may be done in a vacuum and the solution may be heated preferably to a temperature not over 250° F."

Further, at page 1, line 83: "After assembly, the condenser is impregnated in a liquid mixture of borax and glycerin at the required temperature, I have found that one part of borax to four or five parts of glycerin gives good results, but these proportions are not critical and may be varied widely. The liquid impregnating substance may be placed in a suitable container and when the condenser is dipped into it the air is drawn out, so that the impregnation takes place in a vacuum. A mixture of these ingredients is very desirable because glycerin has a high dielectric constant and the borax has good forming properties on aluminum. The impregnation may last for two hours, and after it is finished the condenser is squeezed and compressed enough to expel any surplus of liquid impregnating material. Of course the length of time for impregnation may likewise be varied."

Edenburg heated the glycerin-borax mixture for the purpose of promoting impregnation into the paper spacer. He did not in his patent teach the heating of the borax and glycerin in forming what he called a semisolid type.

If the heating was deemed a factor in the preparation of the electrolyte as such, it would have been prescribed for the semisolid type of condenser, and not solely for the paper spacer condenser.

Edenburg did not specify any boiling point control or any viscosity control or any other interrelated control, and therefore his heating would be ineffective for Georgiev's purpose. His patent affords no suggestion of the control driving off of the correct amount of water.

His specification prescribes: "When the condenser is dipped into it (the liquid impregnating substance in the container) the air is drawn out, so that the impregnation takes place in a vacuum."

There is no suggestion either of the degree of the vacuum or the period during which it is pumped.

The tests of Mr. Cowles show that by following the Edenburg teaching the result achieved by Georgiev could not even be approximated, and even when with the knowledge of today he recreated a control that was unknown and untaught by Edenburg he did not meet with success.

Edenburg did not anticipate Georgiev.

The application for Ruben patent 1,-891,207, filed June 19, 1930.

That patent was declared invalid by the Circuit Court of Appeals.

The application as filed has the following disclosure: "The electrolyte is made by introducing into ethylene glycol at its boiling point a well ground mixture of ammonium borate and boric acid, all dust and grit being kept out of the solution. At this temperature the ethylene glycol forms a clear solution but as the mixture cools, it crystallizes."

Claim 11 of the Ruben application, as filed, reads as follows: "11. The method of making a condenser electrolyte which consists in dissolving in boiling ethylene glycol a mixture of ammonium borate and boric acid, the respective parts by weight being substantially 31%, 27% and 42%."

The Ruben application does not affect the validity of patent 1,815,768, because it does not disclose the invention claimed in that patent, and because Georgiev's date of invention of that patent is prior to the earliest dates proved by Ruben for his alleged invention.

The Ruben application was concerned only with bringing the solid raw ingredients into solution with the glycol or glycerin. There is no suggestion of the "boiling point control," nor even of an attempt to boil the solution as such after once the solid materials had been completely dissolved in the glycol.

Mr. Raines said, "After all the salt was in and dissolved, the boiling was no longer continued."

The results of introducing the solids "into ethylene glycol at its boiling point" would depend on the rate of introduction and of continued heating, but as to that the application is silent.

The proofs submitted by defendant show that Ruben does not drive off all the free water, nor does he drive off part of any water of reaction.

Whatever invention Ruben is alleged to have made, he did not conceive it until May, 1930, and the Raines tests on the subject were commenced and concluded during the month of May, 1930.

Georgiev started boiling his electrolyte as early as December 12, 1928, developed the matter considerably further by September 9, 1929, and by March, 1930, the high-voltage Aerovox condensers, made according to the invention of patent 1,815,768, were already on the market and being sold.

That the dry electrolytic condensers of 400 volts and over up to 500 volts peak, sold by Aerovox beginning March, 1930, were made according to the process of patent 1,815,768 is clearly shown by the testimony of Mr. Siegel, who testified that the method of manufacture of these early high-voltage condensers in which he, as president of the company, was vitally interested at the time, included the steps specified in patent 1,815,768. If there was any belief on the part of Ruben that his disclosure would support the claims of the Georgiev patent or any of them, and that he was entitled to priority, he could have copied them into his application and demanded the declaration of an interference by the Patent Office, but he did nothing.

The Ruben patent, 1,891,207, does not anticipate the Georgiev patent, 1,815,768, in suit.

This brings us to the question of infringement.

Four electrolytes of the defendant are identified as A, B, C, and D.

The use of a polyhydric alcohol is involved in each of these electrolytes, which is glycerin in electrolyte A and glycol in electrolytes B, C, and D. There is involved in each the use of ammonia and boric acid; in the form of ammonium borate in electrolyte A, in the form of ammonium borate with a separate amount of boric acid in electrolyte B, and as aqua ammonia (ammonia water) and boric acid in electrolytes C, and D, with the addition of a very small amount of monoethanolamine in electrolyte D.

There is specified a definite temperature between 120° C. and 131° C. to which the various electrolytes are heated. Boiling occurs in each of defendant's procedures after the temperature of 115 degrees to 117 degrees C. has been reached, and throughout the period required to reach the controlled temperature specified.

The main commercial electrolyte of the defendant is electrolyte C which is typical of the four electrolytes.

As disclosed in patent 1,815,768, so in electrolyte C is used the raw ingredients comprising boric acid, an alkali, specifically aqua ammonia (ammonia water) and a polyhydric alcohol, specifically ethylene glycol. The ammonia water reacts with

some of the boric acid to form ammonium borate.

Electrolyte C specifies heating the mix not merely to dissolve the solid boric acid in the liquid ethylene glycol and ammonia water, and not merely boiling the mix at will, but it prescribed continuing such heating to a temperature of about 124 degrees C. for condensers rated at 400 volts working and lower, and to about 126 degrees for condensers rated at over 400 volts. These temperatures are the respective boiling points of the electrolytes.

It is agreed by both experts that in following this procedure a chemical combination between the ingredients is affected, with definite percentages of the resultant glycol borate and ammonium glycol borate.

It was not until after the issue of patent 1,815,768, and after the Aerovox condensers thereunder had appeared on the market and Aerovox had built up a large business therein, that electrolyte A made its appearance, was superseded by electrolyte B alleged to be somewhat better, which was in turn superseded by electrolyte C, the main electrolyte alleged to be a further improvement and also by electrolyte D, used on a smaller scale in the lower voltage range.

The boiling point control and the ingredients claimed in patent 1,815,768 in suit are incorporated in each of the defendant's electrolytes. A thermometer is used by the defendant, and exclusively today, for determining when the electrolyte has reached completion, as once the predetermined boiling point has been reached no further test is required to show that the correct amount of water has been driven off, the reaction promoted to the desired extent, and that the electrolyte is suitable for its intended purpose.

█ Infringement of the patent in suit cannot be avoided by that which would constitute an improvement where the patented invention is being appropriated, and, therefore, even if a greater proportion of boric acid be used in the C and D electrolytes to produce a more solid electrolyte it would only thicken the electrolyte and render it less flowable and more pastelike, so that it may be spread onto the spacer. Electrically this would produce no improvement or change in the electrolyte, as the more liquid electrolyte is satisfactory electrically speaking. The most that could be claimed would be that there was an improvement in producing a more solid electrolyte, and this does not relieve from infringement.

Claim 10 reads as follows: "10. The method of preparing an electrolyte for electrolytic cells, which consists in admixing boric acid, glycerol and ammonia water and boiling the solution."

This claim was held valid and infringed by the Circuit Court of Appeals in Aerovox Corporation v. Concourse Electric Co., Inc., 65 F.(2d) 386.

Electrolyte C formula includes boric acid and ammonia water (aqua ammonia) as recited in claim 10; electrolyte A uses glycerol as recited in claim 10; while electrolyte B, C, and D use the adjudicated equivalent, ethylene glycol.

Electrolyte A clearly infringes as do also electrolytes B, C, and D, as glycol which is substituted for the glycerin recited in the claim is its full equivalent in this art. Ruben Condenser Co. et al. v. Aerovox Corporation (C.C.A.) 77 F.(2d) 266.

There is nothing in the prior art which compels a limitation of claim 10 to glycerin. Aerovox Corp. v. Concourse Electric Co. (C.C.A.) 65 F.(2d) 386, 388.

Defendant infringes, not in the use of the old raw ingredients whether they be glycerin or glycol, but in the appropriation of the new boiling step as did the defendant in Aerovox Corp. v. Concourse Electric Co., supra.

Claim 8 reads as follows: "8. The method of preparing an electrolyte for electrolytic cells, which comprises admixing alkali metal salt having a boron acid radical with a polyhydroxy alcohol and boiling until the free water and some of the water split off by the reaction is vaporized, with a resultant mixture of glyceryl borate with an alkali metal salt of glyceryl borate."

This claim was held valid and infringed in Aerovox Corp. v. Concourse Electric Co., supra, and clearly applies to each of the four electrolytes and processes of the defendant. In processes C and D, the "alkali metal salt," ammonium borate, is formed from the boric acid and aqua ammonia. It is mixed with polyhydroxy alcohol, in this case, ethylene glycol. In electrolyte B, alkali metal salt is used as such in the form of ammonium borate with the polyhydroxy alcohol, ethylene glycol. Electrolyte A is similar to electrolyte B,

except that glycerin is used in place of glycol as the polyhydroxy alcohol.

The mixture stated in each of these four electrolytes is boiled until the free water and some of the water split off by the reaction is vaporized.

The term "polyhydroxy alcohol," recited broadly in the body of this claim as one of the raw ingredients, includes within its scope glycerin and glycol as well as each of the numerous other polyhydric alcohols; therefore, it is not necessary to invoke the doctrine of equivalents to establish infringement of this claim. Glyceryl compounds mentioned at the end of the claim is no part of the process or method to which the claim is directed. It is recited merely by way of example.

That the defendant "infringes this claim, I am convinced, without resorting to the doctrine of equivalents, but if there was any doubt it should be resolved in favor of the patent. Winans v. Denmead, 15 How. 330, 341, 14 L.Ed. 717; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523; Smith v. Snow et al., 294 U.S. 1, 14, 55 S.Ct. 279, 79 L.Ed. 721.

The defendant's contention that water is not vaporized to the extent recited in the claim, because the water actually given off is less than the fresh water that would result if we assumed that the boric acid all breaks down to metaboric acid and water in the course of the heating process, is not sustained.

This is shown by the testimony of Dr. Frankel, the plaintiff's expert, and the authorities to which he referred and also by the admissions of the defendant's expert, Mr. Cowles, on cross-examination.

Claim 11 reads as follows: "11. The method of preparing an electrolyte for electrolytic cells which comprises subjecting a mixture of boric acid and polyhydroxy alcohol in the presence of an alkali to boiling and continuing until the boiling point at atmospheric pressure is about 130 degrees centigrade."

This claim was held valid by the Circuit Court of Appeals in Aerovox Corp. v. Concourse Electric Co., supra.

In the C electrolyte, there is used a mixture of boric acid and polyhydroxy alcohol (ethylene glycol) in the presence of an alkali (aqua ammonia) and that mixture is subjected to boiling which is continued to a definite boiling point. The same is true of the electrolyte D which has a minute proportion of monoethanolamin added. The same is true of process B in which the alkali ingredient of the ammonium borate is the alkali and also of process A in which the ammonium borate includes an excess of boric acid over and above the alkali (ammonia) present therein.

The boiling points of the defendant's respective electrolytes are as follows:

Process A. Between 122 degrees C. and 125 degrees C.

Process B. Between 120 degrees C., 126 degrees C. and 131 degrees C.

Process C. Between 124 degrees C. and 126 degrees C.

Process D. Between 122 degrees C. and 124 degrees C.

The temperatures for each of processes is specified as at about said respective values.

Claim 11 is not limited in any way to glycerin, but is more specific than claim 10 in designating the boiling point as about 130 degrees C.

The various electrolytes of the defendant do not escape the scope of claim 11, as the use of term about 130 degrees in that claim is repugnant to a limitation of its scope to an electrolyte with a boiling point of precisely 130 degrees C. Nothing in the prior art compels such a limitation in the construction of the claim as the boiling point control of these electrolytes was shown to be broadly new.

It seems to me that this claim is entitled to a liberal construction and applying a reasonable variation to the term "about," each of the defendant's electrolytes A, B, C, and D infringes claim 11.

The defendant cannot escape infringement under the claim that it is manufacturing under patent No. 1,973,602, issued to Milton Bergstein, assignor to Micamold Radio Corporation, for electrolytic condenser containing monoethanolamine, granted September 11, 1934, on an application filed December 10, 1932.

That application was filed on December 10, 1932, more than 16 months after issue of the patent 1,815,768 in suit on July 21, 1931, and to all intents and purposes was a copy of the teachings of patent 1,815,768; the language used being almost the same. There is incorporated in its specifications substantially every original feature of patent 1,815,768, including

the boiling point control; "between 125° and 130° C. in order to drive off part of the water originally present and that liberated by the reactions in the electrolyte."

The only contribution purporting to be novel in that patent is the substitution of monoethanolamine for the ammonia water preferred in the patent 1,815,768, but the monoethanolamine functions as the ammonia used in patent 1,815,768 and is the full equivalent of it, and there is no novelty on which to base a defense.

Defendant promptly abandoned and abolished the allegedly novel feature monoethanolamine, which I hold infringes, and used in its stead ammonia water with equal effectiveness.

Each of the defendant's electrolytes and processes infringes each of the claims in suit.

Patent No. 1,815,768, in suit is valid and infringed.

I will now consider the patent in suit No. 1,789,949 which is herein called the structure patent, claims 11, 18, and 19 of which are in suit.

This patent was held to be valid and infringed by the Circuit Court of Appeals in Aerovox Corp. v. Concourse Electric Co., supra. Claims 11, 13, 19, and 20 were there adjudicated, of those claims 11 and 19 are involved here.

In Ruben Condenser Co. et al. v. Aerovox Corporation, supra, claim 18 as well as claims 11 and 19 were held valid and infringed. That holding the Circuit Court of Appeals did not find it necessary to review as it based its affirmance of this court's decree on the immunity defense alone.

There is no defense of immunity here, and the finding of validity should stand, as I do not consider that any of the evidence offered by the defendant is really new evidence.

The invention of patent No. 1,789,949 was fully described in Ruben Condenser Company and P. R. Mallory & Co., Incorporated, v. Aerovox Corporation (D.C.) 7 F.Supp. 168, at pages 178, 179, 180, and need not again be described here.

Claim 11 reads as follows: "11. An electric condenser comprising a conductive container, a wound electrolytic condenser roll therein and extending longitudinally thereof, a terminal strip protruding from one end of said roll and mechanically joined directly to the wall of said container, said container having an electrical terminal cooperating with said joint, a cover of insulating material for said container, and a binding post through said cover and affixed to the other terminal of said condenser."

This claim sets forth the invention in its broader aspects.

In the consideration of this claim we are not concerned with air voids, convection currents of air, or the character of metal used for the various metallic elements, as none of those features is recited in that claim.

Claim 11, described briefly, relates to an electrolytic condenser comprising a more or less conventional condenser roll, inclosed in a metallic can with the positive lead connected to a positive terminal protruding through an insulating closure of the can; the negative lead of the condenser roll being bonded directly to the can, which can carries means to serve for negative terminal connection.

Both of the defendant's condensers Nos. 1 and 2 (Exhibits 5 and 6) infringe on this claim, as each of them has a paper wrapping and is contained in a can, the positive lead is connected to a binding post which passes through an insulating cover, the rim of the can is rolled over said cover and clamps the negative lead to the can, and said rolled in rim serves as the terminal for electrical connection of the can to the metal carrying plate.

Defendant put in evidence various prior art patents, but the best art was disposed of by the Circuit Court of Appeals in the Concourse Case and by this court in the Mallory Case.

Patent No. 1,229,914 to Dubilier for an electrostatic condenser is relied on to show the state of the art, not by way of anticipation, as it was not pleaded. It is not for an electrolytic condenser, nor for a rolled condenser, but is for a mica stack transmitting condenser, and shows that it is old broadly in electrostatic condensers to connect one terminal to the metal container. The same thing is true of ignition condensers.

British patent 314,160 to Telegraph Condenser Corporation. As to that patent this court said in the Mallory Case as follows: "The plaintiffs contend that in the said British patent 'the electrolyte serves to establish electrical connection between

the can and the cathode foil.' This, however, is not a bonding of the cathode to effect grounding of the can; on the contrary, it increases the electrical leakage seriously, which is precluded in the Georgiev structure patent in suit. The British patentee showed no appreciation of the importance of keeping the electrolyte away from the nonaluminum parts."

The other patents in suit, as well as the practice of the Potter Company, need no further consideration as in them both terminals of the condenser were insulated with respect to the can.

Claims 18 and 19 read as follows:

"18. An electrolytic condenser comprising anode and cathode foils of aluminum, fibrous sheet means between said foils and impregnated with electrolyte, a closely adhering film of dielectric on the anode area, a can of aluminum enclosing said condenser roll and presenting air spaces thereabout, an aluminum part unitary with said cathode foil and in direct mechanical contact with the lateral wall of said can for terminal connection thereto, the anode having a terminal insulated from the can, the voids between the condenser roll and the can being substantially devoid of filling composition thereby to facilitate convection currents of air."

"19. An electrolytic condenser including an active condenser element having electrodes of identical metal, a dielectric film formed on one of said electrodes, an enclosing metallic can of the same metal as said electrodes, the wall of which determines air spaces about the active, condenser element, a terminal for said latter electrode insulated from the can, a terminal for the other electrode directly affixed to said can mechanically and electrically, metallic connecting members electrically and mechanically associating said electrodes with their respective terminals, each of said metallic connecting members being of the same metal as said electrodes, the voids between the active condenser element and the can being substantially devoid of filling composition, thereby to facilitate convection currents of air."

These claims present more specific aspects of the invention.

Both of these claims include in addition to the general limitations of claim 11 the further limitation to air spaces about the condenser roll within the can, which voids are further defined as "substantially devoid of filling composition."

There is a further limitation in claims 18 and 19 that the can is of the same metal as the foils; the metal being specified in claim 18 but not in claim 19 as aluminum. In claim 18 the lead from the cathode foil to the can (but not of the anode foil) is designated as of aluminum. In claim 19 the connecting members both of cathode and anode are recited as of the same metal as the foils and can.

Defendant says that the air voids are useless and not effectively present. This court determined adversely as to that contention in the Mallory Case, 7 F.Supp. 168, 182, and any difference between one of the Mallory condensers in that suit pictured on Exhibit 10 in this suit, and the defendant's condensers, is of degree only.

I am convinced that the defendant's contention is not sustained. If defendant's contention is correct, why did not the defendant follow the prior art and why does it find it necessary to imitate the structure of the patent 1,789,949 in suit?

The defendant in its practice of leaving voids in the can has followed the practice of Georgiev and not of the prior art.

It is somewhat difficult to understand how the condensers, Exhibits 5 and 6, could escape having a larger air space unless they were specially prepared by the defendant by resort to a second and third wax filling after solidification of the wax.

In defendant's condenser No. 1 (Exhibit 5) the can, the foils, and the terminals are all made of aluminum, and it infringes both of claims 18 and 19.

Defendant's condenser No. 2 (Exhibit 5) infringes claim 18. That claim is limited to an aluminum part unitary with the cathode foil and in direct mechanical contact with the lateral wall of the can for terminal connection thereto, and is found in defendant's condenser No. 2. There is no limitation in this claim as to the character of metal used for connection to the positive or anode. This claim reads squarely on defendant's condenser No. 2, though that construction includes insulation covered copper wire within the can connecting the positive terminals to the positive binding posts.

I find nothing in the prior art offered in this case which requires particular discussion, as the closest prior art against claims 18 and 19 has been completely treated in the prior Concourse Case and in this court's decision in the prior Mallory Case.

The British patent 314,160 to Telegraph Condenser Corporation is something closer than the Ruben patent 1,714,191, and was completely disposed of by this court in the Mallory Case.

The additional patents placed in evidence by the defendant without commenting thereon do not as to any of them approach, even remotely, in pertinence the Ruben patent 1,714,191 and the British patent 314,160, both of which have been completely disposed of in former cases.

■ Patent No. 1,789,949 is valid and infringed.

The defense of prior use by Edelman was rejected by this court in the case of Ruben Condenser Co. et al. v. Copeland Refrigeration Corporation, 15 F.Supp. 261, and certainly the testimony of the witness Cobb as to the sheet of observations (Exhibit D) of tests which he says he made on or about December 20, 1928, with some condensers prepared by Mr. Edelman would not cause this court to change the opinion it there expressed. Mr. Cobb does not know what electrolyte was used in these condensers, and he does not even know, but merely infers, that they were electrolytic condensers at all. He could not swear that the device he tested did not comprise two more condenser sections in series. He never subjected these condensers to as much as 500 volts.

The defense of prior use by Edelman was not sustained.

■ The defense of unclean hands, in so far as it is based on the letters (Exhibit W) which are similar to those which formed the basis of the defense of unclean hands in Ruben Condenser Co. v. Aerovox Corp., 7 F.Supp. 168, 174, cannot be better determined than it was in that case at page 174.

Here, as there, the letters were written after adjudication, and in the case at bar they were written to Emerson Radio Corporation, and warned of a suit that was actually brought when Emerson saw fit to disregard those letters.

When the case of Aerovox v. Emerson was called for trial, it was agreed with counsel for the defendant in the case at bar, who also represented Emerson, to discontinue that suit.

The reason for that action is quite apparent, as there would be no purpose in trying the case against the customer (Emerson) before the decision of the case against the manufacturer (Micamold), as the Micamold decision would in all probability dispense with the need for any trial of the Emerson case.

The discontinuance was on consent without prejudice, and counsel now representing the defendant did not press for a dismissal with prejudice.

■ The threats alleged to have been made orally by Mr. Cole I treat with the same degree of seriousness as the witnesses say they treated them.

Having in mind that the Aerovox Corporation had already stated their position in writing, the threat of suit, alleged to have been made by Mr. Cole to Mr. Burress, was not even impressive enough to cause Mr. Burress to notify Micamold Corporation about them. The same may be said about the alleged threats to Mr. Ross, who in addition to not even obtaining a letter from Micamold to guarantee protection in the event of a suit, said, what I find hard to believe, that he welcomes litigation against his customers.

The defense of unclean hands was not sustained.

Both of the patents in suit as to the claims in suit are valid and infringed.

A decree may be entered in favor of the plaintiff and against the defendant, with costs and injunction, and the usual order of reference.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court as provided by rule 70½ of the Equity Rules (28 U.S.C.A. following section 723) and rule 11 of the Equity Rules of this court.